## National Northwood, Inc., v. Buriani

*Englehart, Creany, Englehart & Leahey*, for plaintiff.

*Bionaz & Raptosh*, for defendants.

McDONALD, *P. J.*, April 6, 1973—This matter is before the court en banc on exceptions of defendant to the findings of fact, conclusions of law, judgment and verdict rendered in a nonjury replevin action.

Plaintiff is a Delaware corporation engaged in the sale of feed and other merchandise used for the propagation of mink. During the year 1969, Lee R. Jones and Joan G. Jones, defendants (herein referred to as Jones), who were engaged in the business of raising and selling mink on a ranch in Cambria County, were indebted to plaintiff for mer-

chandise sold to them incident to the business. They executed a security agreement (Plaintiff's Exhibit No. 1) for "all livestock now owned or hereafter acquired by debtor, and young of such livestock." The agreement was recorded. On July 9, 1970, they executed an agreement (Plaintiff's Exhibit No. 2) with plaintiff, acknowledging in paragraph 1, a debt of $10,809.72. In the same paragraph, it is stated a promissory note, payable on demand in that amount, was executed with plaintiff as payee, and said note was secured by "... a security agreement and financing statement covering all mink and their progeny now owned by and in possession of 'Jones.'" The third paragraph of the agreement provided for an extension of credit and the terms of payment. The number of female breeders, males and kits in possession at time of agreement are set forth in paragraph 6 in accordance with a count provided by Jones. The agreement further provided, in paragraphs 7, 8, 9 and 10, for the raising of and safeguarding of stock, the marketing of the 1970 pelt crop, and an option for repossession.

When plaintiff gave notice of its option to repossess, and refused to extend further credit, Jones killed the mink then in his possession and turned over 100 breeders to Peter Buriani, one of the defendants (hereinafter Buriani). The pelts of the slain mink were replevied, and it was suggested during the trial Jones no longer has possession of any mink and in the meantime has filed a bankruptcy petition. The replevin action was begun against both Jones and Buriani on March 10, 1971.

Buriani claims title to the 100 breeders which were turned over to him by Jones, under a contract of sale (Plaintiff's Exhibit No. 3) between him and

Jones, dated December 20, 1968. In that contract he sold 150 female breeders and 20 males to Jones (apparently when Jones had established his business) in consideration of the division of the male offspring pelts for three consecutive years, ending December, 1971. Buriani testified he had only received the pelts for one year.

In reliance on Jones's title and statements in both the security agreement and the agreement of July, 1970, credit had been extended to Jones by the plaintiff through the 1970 breeding season.

Buriani testified that 20 of the female breeders turned over to him by Jones had died before breeding; that the female breeders turned over to him were mingled with his mink and identifiable at the time of the commencement of the replevin action, but now most are probably dead. He further testified that some produced during the 1971 season and some did not, but the average production would have been two to two and one-half mink per breeder. The average value of pelts in 1971 was $12., the average value of a female breeder was $10. to $12., and the average value of a female pelt was $5. to $6. All the kits from his stock were sold during the year. He stated the breeders he received from Jones were "very poor" and probably didn't produce as well as the ordinary breeder that year.

The court rendered a judgment and verdict in favor of plaintiff, finding it had the right to possession of 100 female breeders and the progeny of 80 of these; to wit, 160 pelts. A money judgment in the amount of $2,920. was entered in favor of plaintiff and against defendant, Peter Buriani, with interest.

Defendant contends (1) there was no sale of the breeders and male mink to Jones under the 1968

contract, but in fact they were delivered as an interchange, (2) the July 9, 1970, agreement between Jones and plaintiff extinguished the security agreement of 1969, and was in fact a novation, (3) the damages were not supported by the evidence.

A reading of the contract of December 20, 1968, between Buriani and Jones discloses its language is clear and unambiguous. The title to the mink described passed from Buriani, designated "seller," to Jones, designated "buyer," in consideration of the division annually for three years of 100 male pelts. The contract further states, "the final installment of the *consideration price* shall be the division of the kits of 1971 crop year." (Emphasis supplied.) Thus, the failure to receive the division of kits in 1970-71 would give Buriani a cause of action for damages but not repossession rights.

However, he contends there was a custom and usage in the trade to interchange breeders, and the contract of December 20, 1968 must be interpreted accordingly. While there may be such custom and usage in the trade, it was not fully explained. For instance, what is the status of the interchanged items and what are the respective rights of the parties to such a transaction? Does it pass legal title subject to a lien on the interchanged items? Does the one receiving the items merely have a possessory right, or has he a legal title? What are the rights and liabilities where there is a breach of the transaction? The record is barren of evidence to answer these vital questions. Where, as here, it is sought to interpret a contract in the light of custom and usage, the various rights and liabilities and legal bases which explain the custom and usage must be evident, since it may not be used to enlarge or abridge the terms of a contract.

Notwithstanding the paucity of evidence to show the custom and usage, it cannot vary the express terms of a contract: Universal Film Exchanges, Inc. v. Viking Theatre Corp., 400 Pa. 27, 41; Cost v. Dean, 161 Pa. Superior Ct. 160. This rule would seem to be even more apropos, where, as here, there have been intervening rights of a third party dealing in reliance on the ownership of the mink. Obviously, it was the feed provided to Jones by plaintiff on the security of the mink which kept them alive and producing. To now hold that the express terms of a contract should be varied by a custom and usage of the trade, because, as argued, it was "a home-drawn" contract, is not convincing and would not only be contrary to the law but produce a most inequitable result.

The contract of July 6, 1970, was not a novation resulting in the extinguishment of the security agreement of 1969. A novation requires the displacement and extinction of a valid contract, the substitution for it of a valid new contract, the consent of the parties and a new consideration.

An examination of the July 9, 1970, agreement between plaintiff and Jones indicates (in paragraph 1) the pre-existing debt was evidenced by a promissory note "secured by a security agreement and financing statement covering all mink and their progeny now owned by and in possession of Jones." A reading of the provisions of the agreement shows it was clearly intended to provide an extension of credit in a situation where Jones was financially floundering, and plaintiff would have, in event of his failure, suffered a loss. It is evident, in addition to extending credit, the agreement was intended to provide for the raising, safeguarding of health and marketing of the 1970 "kits." Thus,

plaintiff was merely providing, in addition to the security agreement of 1969, additional protection of its debt by control over the raising and marketing of the 1970 crop.

This agreement cannot be, in view of its plain words and the intent evidenced in its provisions, construed as an extinguishment of the 1969 security agreement, particularly where that agreement is specifically preserved in paragraph 1. We are satisfied, in the posture of impending insolvency then facing Jones, it was a supplement to the security agreement of 1969, extending credit and providing for additional controls on the 1970 crop.

The record fully supports the damages awarded in the verdict. Buriani, who is a successful breeder of mink, testified to the average pelt price in 1971, as well as the value of a female breeder at that time. He was given credit for the 20 nonproducing female breeders turned over to him by Jones, and calculation of the progeny of the remaining 80 was based on his lowest estimate of average production. In our opinion, findings of fact 8, 9, 10 and 11, which provide the basis for computation of the damages awarded, are fully supported by the evidence.

We are satisfied the exceptions of Buriani to the findings of fact, conclusions of law, judgment and verdict are without merit and therefore the judgment and verdict will be affirmed.

## ORDER

Now, April 6, 1973, upon consideration of the record and briefs, the exceptions of Peter Buriani, defendant, are dismissed.

The prothonotary is directed to enter judgment on the verdict upon payment of the usual fees.